# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

No. 3:16-cr-107 (JAM)

ELLSWORTH ROBERTSON,
*Defendant.*

## RULING GRANTING MOTION TO SUPPRESS

BACKGROUND ................................................................................................................1

A. Events of November 7, 2015, at the Mohegan Sun Casino ................................................2

B. Events of May 2016 re the Arrest of Robertson and Related Searches and Seizures...............5

    1. The Arrest of Robertson.................................................................................................7

    2. The Protective Sweep of Robertson's Apartment...........................................................8

    3. The Seizure of the Safe .................................................................................................9

    4. The Securing and Search of Robertson's Apartment......................................................12

    5. The Search of the Safe ...................................................................................................16

DISCUSSION ...................................................................................................................16

A. Evidence Seized at the Mohegan Sun Casino....................................................................18

    1. *Terry* Stop and Frisk ....................................................................................................19

    2. Consent Search..............................................................................................................23

    3. Inevitable Discovery .....................................................................................................26

B. Evidence Seized from Robertson's Apartment...................................................................28

    1. Robertson's Expectation of Privacy...............................................................................28

    2. Entry into Robertson's Apartment and Initiation of Protective Sweep .............................31

    3. Duration and Scope of Protective Sweep and Search Incident to Arrest...........................33

    4. Seizure of the Safe ........................................................................................................35

        a. Plain View Exception .............................................................................................35

        b. Exigent Circumstances Exception ...........................................................................37

    5. Fruit of the Poisonous Tree and the Exclusionary Rule ..................................................42

        a. Fruits of Unlawful Search of Robertson at the Mohegan Sun Casino........................44

        b. Fruits of Unlawful Search of Table Drawer in Robertson's Apartment....................46

        c. Fruits of Unlawful Seizure of the Safe ....................................................................48

CONCLUSION..................................................................................................................50

## RULING GRANTING MOTION TO SUPPRESS

Defendant Ellsworth Robertson is charged with multiple drug trafficking and firearms offenses. He moves to suppress essentially all of the incriminating evidence against him, on the grounds that the police obtained this evidence in violation of his Fourth Amendment rights. I agree that the police violated Robertson's rights and that they did so in a reckless and flagrant manner that warrants invocation of the exclusionary rule. Accordingly, I will grant defendant's motion to suppress.

### BACKGROUND

The charges against Robertson stem from physical evidence recovered during the course of two encounters that he had with law enforcement authorities. The first occurred late one night in November 2015 at the Mohegan Sun casino in Uncasville, Connecticut. While investigating a reported stabbing incident, a tribal police officer at the casino searched Robertson and recovered crack cocaine from a small drawstring bag that the officer found in one of Robertson's pockets.

The second encounter occurred more than six months later in mid-May 2016. By that point, Robertson was under intense investigation for narcotics trafficking by a consortium of federal, state, and local law enforcement authorities. The authorities decided to arrest Robertson late one night at his apartment in New London, Connecticut. This in turn led to a cascading series of searches and seizures of narcotics and firearms that Robertson had stored in his apartment and in a safe he had kept there.

Based on the evidence presented at the suppression hearings, I make the following factual findings about each of these two encounters:

1

### A. Events of November 7, 2015, at the Mohegan Sun Casino

Around midnight on November 7, 2015, someone stabbed a victim with a knife at a nightclub at the Mohegan Sun casino. The casino is run by the Mohegan Tribe, and tribal police soon arrived on the scene and interviewed witnesses who described the suspect. At about 1:30 a.m., a witness pointed out a person who was sitting on a bench in the box office area of the casino as "possibly" the person responsible for the stabbing. Officers saw that the person on the bench matched the physical description of the suspect that they had received earlier. The person on the bench was Ellsworth Robertson, the defendant in this case.

Sergeant Clifford Barrows of the tribal police approached Robertson and asked to speak with him. Robertson agreed, and the two walked over to the middle of the box office's retail area. Barrows saw that a pocketknife was clipped to the right side pocket of Robertson's pants, and he seized the knife.

Sergeant Barrows and Robertson then had a conversation. Consistent with the testimony of Sergeant Barrows at the suppression hearing and as shown in video from the casino's surveillance cameras, four other officers stood nearby, a few feet behind Robertson to either side. None of the officers had their weapons drawn, and Robertson was not handcuffed.

While still standing with Sergeant Barrows, Robertson briefly took a call on his cell phone. After this phone call, Sergeant Barrows told Robertson that police were investigating a stabbing incident and asked if he was involved. Robertson denied involvement.

Sergeant Barrows told Robertson, "I want to check you for similar weapons." Robertson responded with words to the effect of "Go ahead." Doc. #38 at 20. Sergeant Barrows then walked Robertson over to the wall, near the box office window. Robertson put his arms on the wall in order to be frisked.

2

Sergeant Barrows proceeded to search Robertson for more than two minutes, which included patting down his clothing as well as reaching into his pockets and removing various items. He first removed a black cloth bag that was sewn closed and had some hard objects in it. Robertson said that the bag contained religious items. Sergeant Barrows placed the bag on a nearby shelf without opening it. He then removed a number of additional items from Robertson's pockets, including a wallet, a large quantity of cash, and a cell phone. He placed each item on the shelf.

Finally—and most critically for purposes of this ruling—Sergeant Barrows removed from one of Robertson's jacket pockets another black, cloth drawstring bag. The bag was about six to eight inches long. Sergeant Barrows testified that the bag was a "pouch [that] was not drawn fully closed" and that "it could be opened or reclosed at any point." *Id*. at 22. The bag was neither "drawn tightly closed" nor "wide-mouth open," and it was open at the top about a "quarter inch, half inch opening, I'm going to guess." *Id*. at 63; *see also* Doc. #39 at 48–49 (same).

Sergeant Barrows felt the outside of the bag and felt "rocks in it" and thought this was "weird." Doc. #38 at 60. He then decided to look inside the bag without opening it:

> I could see white and what appeared to be white material wrapped in plastic, like Saran wrap or a plastic bag type of material. I've commonly seen narcotics packaged that way for sale on the street.

*Id*. at 58–59; *see also id.* at 21 (Sergeant Barrows' testimony on direct examination that "I could see into the interior of the bag" and saw "what appeared to be white material wrapped in plastic" and that "being involved in narcotics cases in the past, I thought that this might be narcotics packaged for sale or just narcotics").

Based allegedly on what he saw when he looked into the bag, Sergeant Barrows then "opened up the bag and it appeared to me that it was white rock-like powder." *Ibid.* According to Sergeant Barrows, "the appearance was what I had recognized as previously seen as narcotics packaged for street sale." *Ibid.*

Sergeant Barrows placed Robertson under arrest for narcotics possession. *See* Doc. #23-1 at 2 (arrest report). He walked Robertson to the security office and read him his *Miranda* rights, and then he performed a field test on one of the baggies of white powder, which tested positive for cocaine.

During the course of Sergeant Barrows' testimony, I had doubts that he could see what he claimed he saw inside the black bag. According to Sergeant Barrows, the lighting in the box office area of the casino was no brighter and perhaps "a little bit dimmer" than the lighting in the courtroom. Doc. #39 at 51–52. Because the Government did not produce the bag at the initial suppression hearing, I asked the Government to produce the bag for inspection at a later hearing. At this later hearing, I asked the Government's case agent to place a white Kleenex inside the bag and to hand me the bag for examination. *Id.* at 35–36. With the bag about a half-inch open as Sergeant Barrows had testified it was, I could barely see that there was any object at all inside the bag, much less could I visually ascertain what the object was. This examination reinforced my concern that Sergeant Barrows could not actually see what he claimed he saw before he opened the bag.

Based on my consideration of Sergeant Barrows' demeanor and the content of his testimony, as well as my own examination of the drawstring bag at the suppression hearing, I do not credit Sergeant Barrows' testimony about what he claimed to see inside the bag before he opened it. The bag was black and opaque, and very little light could penetrate the mostly closed

opening of the bag. There was not enough light for Sergeant Barrows to have identified cocaine inside the bag, especially considering that for Sergeant Barrows to have seen the cocaine he would also have to have viewed it through the filter of the plastic wrapping in which it was encased. Barrows had a hunch (a correct one, as it turned out) that the bag had narcotics inside. But he did not see—and therefore did not have knowledge or probable cause to believe—that the bag contained narcotics until *after* he opened the drawstring of the bag and removed its contents.

I have given due regard to Sergeant Barrows' training and experience. But no amount of intuition from one's training and experience is a substitute for the basic laws of light and physics. Sergeant Barrows did not see what he claimed to see.

I further conclude that, although Sergeant Barrows initiated the search of Robertson's person to look for weapons, Sergeant Barrows did not open the bag in order to search for weapons. Sergeant Barrows opened the bag only after he allegedly saw cocaine inside, and his purpose was to recover cocaine, not to neutralize any threat from weapons.

Nor was there anything about the bag or Sergeant Barrows' handling of the bag on its outside that otherwise suggested it contained any kind of weapon. The fact that Sergeant Barrows had already set a similar bag aside without searching inside is a further indication that he did not have any basis to conclude that the bag he ended up opening had any weapons inside. I find that Sergeant Barrows did not believe and had no reasonable belief that the bag contained any weapons.

### B. Events of May 2016 re the Arrest of Robertson and Related Searches and Seizures

In the months leading up to May 2016, Robertson came under investigation by several law enforcement agencies, including the police in the City of New London, the Connecticut Statewide Narcotics Task Force, and the federal Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"). These agencies were collaborating to investigate Robertson and another individual named Tyrone Henry for suspected drug trafficking.

The lead case agent for this investigation was Special Agent Daniel Prather of the ATF. The investigation involved physical surveillance of both Robertson and Henry, as well as monitoring of Robertson's and Henry's cell phones pursuant to court orders for pen register and cell tower tracking information.

Throughout the investigation Robertson was on supervised release for a prior federal narcotics trafficking conviction. *See United States v. Robertson*, 3:07-cr-205 (SRU) (D. Conn.). The conditions of his federal supervised release required Robertson to inform his probation officer of his residence. Although Robertson had told his probation officer that he lived in Hartford, the investigation revealed that he often stayed at a third-floor apartment at 35 Union Street in New London.

On May 16, 2016, Agent Prather applied to a federal magistrate judge for a federal arrest warrant for Robertson. To establish probable cause to arrest Robertson, Agent Prather relied principally on the fact that Robertson had been found with cocaine at the Mohegan Sun casino on November 7, 2015, as described above. *See* Doc. #1-1 (criminal complaint and affidavit). Although Agent Prather secured an arrest warrant for Robertson, he did not apply for or secure a search-and-seizure warrant for Robertson's apartment.

On the following day of May 17, 2016, officers engaged in surveillance of Robertson and Henry, both through covert physical surveillance and by tracking their cell phones. Officers who were posted outside Robertson's apartment in New London saw Robertson leave and return several times in his car. At one point, an individual who officers believed was associated with Robertson drove slowly by the officers in their unmarked surveillance vehicle and looked inside.

Believing they had been "made," the police switched out their vehicle to another unmarked vehicle. After the last time that officers saw Robertson leave the apartment that night, they did not observe him return to the apartment, and they could not locate his car. Eventually, however, they learned from cell phone tracking data that Robertson had somehow returned to the apartment.

### 1. The Arrest of Robertson

The officers decided at that time to execute the arrest warrant for Robertson at his New London apartment, as well as to execute a separate arrest warrant for Henry at a residence in Uncasville which is about five miles away from New London. It was by then shortly after midnight in the early morning hours of May 18.

At least nine officers gathered outside Robertson's apartment building in New London. The officers at the scene included two New London police officers, two Statewide Narcotics Task Force officers, one United States Marshal, and at least four or five ATF agents.[1]

Five or six of the officers entered the third-floor hallway of the apartment building, while the remaining officers remained stationed elsewhere around or outside the building. The officers knocked on the door to Robertson's apartment repeatedly and heard movement inside the apartment, including footsteps and "soft noise," possibly a television or voices inside.

After four or five minutes, Robertson opened the door. He was standing with half of his body visible and the other half of his body blocked by the door. Multiple ATF agents yanked Robertson out of his apartment and "passed him back" from officer-to-officer down the hallway, where he was then handcuffed and searched. Doc. #38 at 219–20. Robertson was secured and

---

[1] The terms "police" and "officers" are used in generic terms throughout this ruling to refer not only to police officers from the New London police department but to all other law enforcement agents involved in this action, including agents of the ATF.

immobilized in double-lock handcuffs. *Id.* at 168 ("We double-lock them so they don't move" and "I think they were double-locking him").

### 2. The Protective Sweep of Robertson's Apartment

While Robertson was being arrested and secured outside in the hallway, most of the officers rushed into the apartment, ostensibly for the purpose of conducting a "protective sweep" to ensure that nobody else was in the apartment who might harm them. The officers looked in the living room, kitchen, dining room, bedroom, and bathroom. There were no lights on in the apartment, and some of the officers used flashlights.

No one was found inside the apartment. But one of the officers—Jeremy Zelinski of the New London Police Department—saw a safe in the far right corner of the bedroom closet. At the suppression hearing, Officer Zelinski testified that using his flashlight he saw a "powder or dust substance" on top of the safe but that he did not then know what the substance was.[2]

Following the protective sweep, the officers brought Robertson back into the apartment from the hallway. It had now been about five minutes from the time that they had arrested and handcuffed him in the hallway outside the apartment until they completed the protective sweep and brought him back inside the apartment. Doc. #38 at 220. The officers had Robertson stand near the door in handcuffs as they searched the couch near the door, and then they had him sit on the couch.

While Robertson was still standing in handcuffs near the door, Officer Zelinski decided to open a drawer of a small table that was in the corner behind the front door of the apartment. The table and the doorway are shown in a photograph that was introduced at the suppression

---

[2] *See* Doc. #38 at 130 ("There was a substance on top of the safe, at the time I didn't know what it was, but there was a substance."); *id.* at 167 ("Q. Was there anything on top of the safe? A. Just the powder or dust substance that I initially saw at first glance."); *id.* at 180 ("It was a quick glance. I looked in there, I saw some powder or residue, dust-type substance, so I didn't look closer.").

hearing. *See* Gov. Exhibit 4B. Officer Zelinski testified that he opened the drawer to look for a firearm, allegedly "believing that Robertson could have reached for a gun, [because] it was within his wing span to reach for a firearm." Doc. #38 at 192; *see also id.* at 200–01.

Instead of finding a gun, Officer Zelinski saw packages of cocaine. He showed the cocaine in the drawer to an ATF agent who was on the scene. The officers left the cocaine in place at that time inside the drawer.

I found Officer Zelinski not to be a credible witness in large part. I do not credit his explanation for why he looked in the drawer. I believe that he was looking for narcotics when he opened the drawer and that he did not look inside the drawer to protect himself or others from weapons. Robertson was already well-secured in handcuffs, having been forcibly yanked out of the apartment for this very purpose. With numerous other agents around and no apparent legitimate reason for Robertson even to have been brought back into the apartment after having been taken into the hallway, Officer Zelinski had no credible safety concern to justify his opening of the table drawer.

### 3. The Seizure of the Safe

Robertson was asked to consent to a search of the apartment. He declined to do so. The police then decided to remove the safe from the apartment without Robertson's consent and over his objection.

A significant part of the suppression hearing focused on why the police decided to take Robertson's safe from the apartment despite their lack of consent or a warrant to do so. I learned that the police removed the safe on the instructions of Agent Prather, who as noted above was the lead case agent for the investigation.

Agent Prather himself was not at Robertson's apartment. He was miles away in Uncasville to take part in the simultaneous arrest action against Tyrone Henry. After receiving consent from Henry's girlfriend to search Henry's apartment, officers at that apartment had located a safe, and a police canine on the scene had alerted to the safe for the presence of narcotics. *Id.* at 252.

Upon learning by telephone that Robertson also had a safe in his apartment, Agent Prather told the officers at Robertson's apartment to remove the safe "for safekeeping." *Id.* at 183. According to Agent Prather, "there was concern that there might be other people with access to the apartment," and law enforcement "didn't have personnel to secure the scene in New London at that time." *Id.* at 253.

I asked Agent Prather what basis he had to remove the safe from the apartment. In essence, he told me that he had no factual basis. He stated that he ordered the safe to be removed without knowing that there had been any narcotics or contraband found in Robertson's apartment:

> THE COURT: I'm unclear. At the time that you instructed the safe be removed, did you know about the residue on top of the safe?
>
> THE WITNESS: I did not, no.
>
> THE COURT: And you didn't know about the crack in the drawer?
>
> THE WITNESS: I did not.

Doc. #39 at 20–21. Agent Prather went on to further explain his reason for ordering removal of the safe:

> So my feeling at the time was that they were exiting the apartment, at that moment I wasn't thinking we were going to re-apply for a search warrant of the residence and I did not know whether anybody else had access or we would be able to secure the apartment for the appropriate amount of time to be able to apply for a search warrant. So I asked that they remove it.

10

*Id.* at 20.

On further questioning by the Government, Agent Prather testified that "there was nobody immediately available" to "sit" on the apartment for purposes of securing it pending a search warrant. *Id.* at 22. According to Agent Prather, securing the apartment might be "fruitless," as "we may not even be able to apply for a search warrant, [because] I didn't have the other information [of cocaine in the drawer and residue on the safe] at the time." *Ibid.*

When the police removed the safe from the apartment, Robertson objected to them taking the safe. Doc. #38 at 182 ("Mr. Robertson was arguing with us why are we taking the safe."). The officers ignored him and brought the safe down the hallway and into an elevator. While the safe was in the elevator, Officer Zelinski now took a closer look at the unidentified substance he had earlier seen on top of the safe and determined that it was a "white powder residue." *Id.* at 130–31, 181.

An ATF agent and a task force officer took possession of the safe and transported it in the back of the ATF agent's car to the state police barracks in Westbrook. This was about 20 miles away from New London. There they met Agent Prather. At around 2:00 a.m. or 2:30 a.m., one of the ATF agents tested the substance on the top of the safe with a narcotics field test kit, and the substance tested positive for cocaine. *Id.* at 255–56.

That was not the end of the safe's journey that night. From the state police barracks in Westbrook the safe was then driven another 25 miles west by the ATF agent and the task force officer to the ATF's office in New Haven (at least 45 miles away from New London). In New Haven the safe remained unopened in ATF custody for the next two days. *Id.* at 257–58.

### *4. The Securing and Search of Robertson's Apartment*

The New London police decided to seek a search warrant for Robertson's apartment.

According to the New London Police Department Incident Report, the apartment was secured

with evidence tape by the officers as they left, and a posted officer was put on guard until the

search warrant was executed at shortly after 10 a.m. that morning:

> Officers exited the residence shutting and locking the front entry door to apartment 303.
> The front entry door is the only access door to the apartment. Officers secured the door
> with evidence tape and a police officer while a search warrant was applied for. The
> evidence tape and officer remained intact and on scene until search warrant was executed.
> The search warrant for 35 Union Street Apartment 303 was signed and then served at
> 1010 hours.

Doc. #23-1 at 17.

I asked Officer Zelinski whether it was police practice to secure a scene (*i.e.*, post a

police guard) pending application for a search warrant and, if so, why the safe had been removed

from the premises rather than leaving the safe in the premises until a search warrant could be

obtained. The following colloquy ensued:

> THE COURT: In those instances [where a search warrant is being sought] do you
> know whether it's standard practice for the police simply to secure the scene until they
> get a warrant other than removing the evidence and then getting the warrant?

> THE WITNESS: Typically in this case when we're at the scene, we would secure
> the scene until we get a warrant, which we did secure it once Robertson had left.

> THE COURT: So once Robertson had left, I know you were seeking a warrant for
> the apartment itself?

> THE WITNESS: Correct.

> THE COURT: Did you post somebody outside the apartment?

> THE WITNESS: Yes.

> THE COURT: To make sure nobody could go in and out?

12

THE WITNESS: Correct. If you go back to one of the images of the front door [Gov. Exhibit 4A], there was evidence tape around the perimeter of the door and on the key – on the handle of the door where the key is entered. An officer was there as well.

THE COURT: So in light of the fact that you had somebody there . . . knowing it wasn't your call [but Agent Prather's decision] to remove the safe, to your knowledge was there any reason why the safe had to be removed before a search warrant was obtained for the apartment or the safe?

THE WITNESS: No, it was only my belief that they feared someone would come back and take things from the residence, which we've had happen before.

THE COURT: But in this case you had the residence secured with an officer standing out there?

THE WITNESS: Yes, after we secured it with the tape, the officer then came. There was a brief amount of time that there wasn't an officer there. It was secure with the tape, sealed the door. And then an officer came shortly thereafter.

THE COURT: But you had some nine different agents at the scene so it could have been secured, right?

THE WITNESS: Yes.

Doc. #38 at 184–85; *see also id.* at 198–99 (Officer Zelinski stating that it was not necessary for him to seize the cocaine he had seen in the table drawer because "we had secured" the apartment and were "going to apply for a warrant" and unable to explain in light of the securing of the apartment by the police why it was necessary to remove the safe from the apartment).

Officer Zelinski signed a sworn application in support of a search warrant that was obtained on the morning of May 18 from a state court judge. Doc. #24 at 3–10. According to Officer Zelinski's warrant affidavit, the principal basis for probable cause to believe that there was cocaine in Robertson's apartment was that the residue on the exterior of the safe had tested positive for cocaine.

Officer Zelinski's affidavit omitted certain facts. First, it did not disclose that the safe had been removed from the apartment and that the field testing of the residue on the safe had taken

place only after the safe had been removed from the apartment.[3] The omission of these facts deprived the state court judge of an opportunity to consider whether the removal of the safe and subsequent testing of the residue was a constitutionally permissible basis for probable cause. Rather than disclosing the removal of the safe, Officer Zelinski's affidavit stated the police's intent to search safes that might be found in the apartment, leaving a misleading impression that the safe was there to be searched as part of the search warrant for the apartment, when in fact—as Officer Zelinski well knew—the safe was long gone, dozens of miles away.

Second, Officer Zelinski did not disclose that he had seen cocaine in the drawer of the table near the door of the apartment. That was odd if Officer Zelinski believed that his search of the table drawer was a lawful one. According to Officer Zelinski, he was told by an investigator and a head judge at the Superior Court that he did not need to include this fact, because "they said I had enough probable cause without it." Doc. #38 at 185.[4] I inquired of Officer Zelinski "[w]as there a reason not to include it, though?" *Id.* at 186. Officer Zelinski responded: "No. No." *Ibid.*

I also asked Officer Zelinski whether his discovery of the cocaine in the drawer otherwise mattered to him in deciding to apply for the search warrant of the apartment in the first instance:

> THE COURT: Okay. And in your mind when you're deciding to apply for a warrant, was it significant to you that you had seen this cocaine in that nightstand drawer?
>
> THE WITNESS: Yes.

*Ibid.*

---

[3] Officer Zelinski's affidavit for the search warrant of the apartment stated: "During the secondary search [protective sweep of the apartment] officers observed in plain view a medium size safe in the bedroom closet of Robertson['s] room. On top of the safe was a white powder substance consistent with that of cocaine residue. A Nik Swab for cocaine showed a positive reaction for the presence of Cocaine." Doc. #24 at 5 (¶ 9).

[4] Officer Zelinski later changed his testimony to say that it was "an investigator and a prosecutor" that gave "advice about what needed to be included for probable cause with respect to what [he] had seen in that drawer." Doc. #38 at 196.

14

Counsel for the Government followed up the Court's line of inquiry as follows:

> Q. The Judge had asked you questions about not including the information concerning the drugs being in the drawer to the small table. And so this record is clear, that was somebody else's decision not to include that in there?
>
> A. Right. I asked if they wanted it to be included. I was told that I have enough probable cause as it is.
>
> Q. Okay. In any event, that wasn't something that you consciously eliminated?
>
> A. No. I made it open to the Court what I observed.

*Id*. at 194.

I do not believe Officer Zelinski. I do not believe his claim that one or more investigators, prosecutors, or judges of the Connecticut Superior Court told him to omit as merely superfluous the fact that he had seen cocaine in the drawer. To the contrary, Officer Zelinski testified that his having seen the cocaine in the drawer at the apartment was significant to his decision to apply for a search warrant. I conclude that Officer Zelinski did not include the fact that he had seen cocaine in the drawer because he knew or suspected or was told that his warrantless search of the drawer was legally improper (which it was, as I will explain later in this ruling) and that its inclusion in the affidavit could engender a challenge by Robertson to the legality of the search warrant.

The police executed the search warrant shortly after 10:00 a.m. on the morning of May 18. Among the items recovered from the apartment were the cocaine from the table drawer, multiple cell phones, clear plastic sandwich bags, almost $5,000 in cash, and several digital scales.

15

### 5. The Search of the Safe

While the police were searching Robertson's apartment in New London, Robertson's safe remained in storage at the ATF's office in New Haven. It would be another two days before the police would apply for a warrant to search the safe.

On May 20, Officer Zelinski applied for a state court warrant to search the safe. Officer Zelinski's affidavit in support of the search warrant was similar to his prior affidavit for the apartment search warrant, except that now he disclosed that the safe had been removed from the apartment, and he also described the results of the search of the apartment. Doc. #24 at 12–20.

Because the safe had been in ATF custody, I asked Agent Prather why it took two days to apply for a search warrant for the safe, and the following colloquy ensued:

> THE COURT: Just one question. To your knowledge, is there any reason why a warrant to search the safe was not sought on the 18th and why a delay, there was a delay until the 20th?
>
> THE WITNESS: I don't recall why there was a delay until the 20th. My recollection as to why it wasn't immediately sought on the 18th, we were still processing what had happened the night before. We knew we had the safe secured with ATF. So at leas[t] at that point the goal was to go back into the apartment, complete that portion of the search, and then re-assess. But I don't remember any specific reason why it wouldn't have been sought at that point other than that, logistics.

Doc. #39 at 19–20. I conclude on the basis of this testimony that there was no good or legitimate reason why the police delayed in seeking a search warrant for the safe.

After the state court search warrant was approved, Agent Prather transported the safe back to New London from the ATF's office in New Haven. At the New London police department, the safe was forced open, and the police found inside large amounts of cocaine and heroin, as well as two loaded firearms, a digital scale, and other incriminating evidence.

## DISCUSSION

The Fourth Amendment protects the rights of the people "to be secure in their persons,

16

houses, papers, and effects, against unreasonable searches and seizures," and further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

When a criminal defendant moves to suppress evidence on Fourth Amendment grounds, courts ordinarily consider one or more of several questions in sequence. As a threshold matter, was there a "search" or "seizure" that triggers the protections of the Fourth Amendment? If so, then did the government have a court-authorized warrant to justify the search or seizure and did the government act in accord with the warrant? If there was no warrant, was the government's search or seizure justifiable under any of the well-recognized exceptions to the Fourth Amendment's warrant requirement? Lastly, if the government's action was unlawful, is exclusion of evidence an appropriate remedy? All of these questions arise in one way or another in this case.

As its words make clear, the Fourth Amendment's protection applies only if there has been a "search" or a "seizure." These terms are now well defined. A "search" for purposes of the Fourth Amendment occurs either when the government intrudes upon a person's reasonable expectation of privacy or, alternatively, if the government otherwise intrudes upon a suspect's person, home, papers, or effects for the purpose of acquiring evidence. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013); *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012). A "seizure" of a person occurs for purposes of the Fourth Amendment if the police arrest a person or otherwise intentionally restrict a person's freedom of movement to the point that a reasonable person would not feel free to terminate the encounter with the police. *See Salmon v. Blesser*, 802 F.3d 249, 252–55 (2d Cir. 2015); *Ozga v. Elliot*, 150 F. Supp. 3d 178, 187–88 (D. Conn. 2015).

In addition, a "seizure" of property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interest in that property. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992).

If the police have conducted a "search" or a "seizure," the general rule is that the Fourth Amendment requires the police to have acted pursuant to a court-authorized warrant. *See, e.g.*, *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015). But there are numerous well-established exceptions to the warrant requirement, many of which are at least arguably implicated in some manner by the facts of this case and that will be discussed as they arise in context below. I will first discuss the search and seizure of evidence from Robertson at the Mohegan Sun casino and then discuss the search and seizure of evidence at Robertson's apartment in New London.

### A. Evidence Seized at the Mohegan Sun Casino

As noted above, Sergeant Barrows searched Robertson at the Mohegan Sun casino and seized cocaine from a small black drawstring bag that he found in Robertson's pocket. Because there is no dispute that Sergeant Barrows conducted both a search of Robertson and a seizure of evidence, and that he did not have a warrant to do so, the key question is whether there is some exception to the warrant requirement that justified his actions. Here the Government claims two exceptions apply: (1) that the search and seizure was justified as part of a limited investigative detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968); and (2) that the search and seizure was justified by Robertson's consent. The Government further argues that any violation of Robertson's rights should not warrant exclusion of the cocaine evidence, because the cocaine would have been inevitably discovered by Sergeant Barrows at a later time. I will consider each of these arguments in turn.

### *1.* **Terry** *Stop and Frisk*

One exception to the warrant requirement is colloquially known as a "*Terry* stop and frisk." Under this long-established exception, if a police officer has a reasonable suspicion of criminal wrongdoing, then the police officer may briefly detain a suspect for investigative purposes (*e.g.*, for questioning) and may also conduct a frisk or a patdown of the person to assure the officer's personal safety during the stop if the officer has reasonable grounds to believe the suspect to be armed and dangerous. *See Terry*, 392 U.S. at 30; *Dancy v. McGinley*, 843 F.3d 93, 106–07 (2d Cir. 2016); *United States v. Bailey*, 743 F.3d 322, 331–32 (2d Cir. 2014).

Robertson does not dispute that the *Terry* rule allowed Sergeant Barrows to stop him. The information known to Sergeant Barrows gave him ample reason to believe that Robertson could have been the perpetrator of a stabbing.

Likewise, in view of the violent nature of the incident under investigation and Sergeant Barrows' seizure of the pocketknife that was visibly clipped to Robertson's pocket, I further conclude that it was well within the *Terry* rule for Sergeant Barrows to conduct a patdown of Robertson for any more weapons. I do not agree with Robertson's argument that, because Sergeant Barrows had already seized one weapon from Robertson, he could not justifiably fear that Robertson might have more weapons on him.

But the fact that Sergeant Barrows had authority to stop Robertson and to conduct a frisk or patdown for weapons does not resolve the lawfulness of his actions, because *Terry* imposes yet a further limitation on the scope of an officer's patdown of a suspect for weapons. As the Supreme Court has ruled, "a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others

19

nearby," and "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) (noting that "the purpose of this limited search [for weapons] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence").

Thus, in *Dickerson*, the Supreme Court held that a *Terry* search exceeded its permissible scope when an officer squeezed, slid, and otherwise manipulated the exterior of a suspect's pocket in an effort to ascertain that the item inside the pocket was crack cocaine. Similarly, in *United States v. Casado*, 303 F.3d 440 (2d Cir. 2002), the Second Circuit concluded that a *Terry* search exceeded its permissible scope when a police officer reached into a suspect's pocket to pull out an item of contraband rather than doing an exterior patdown of the pocket to determine in the first instance if the item was a weapon.

The reasoning of *Dickerson* and *Casado* controls here. When Sergeant Barrows decided to open the drawstring bag, he did not have reason to believe that the bag had a weapon inside. His testimony was that the bag felt weird and had rock-like objects. He did not feel the outline of a gun, a knife, or some other instrument of harm. He had already examined another similar bag that was sewn shut and that also had hard items inside, but he set that bag aside without opening it up to look for weapons.

Moreover, Sergeant Barrows testified that he opened the bag because he thought there was cocaine inside, not because he thought there was a weapon inside.[5] As I have already

---

[5] *See, e.g.*, Doc. #39 at 50 ("And after I saw the white plastic inside or white covered plastic, my suspicions became aroused it was probably narcotics. So I went like this . . . and I looked inside and I saw what I saw."); Doc. #38 at 64 ("Q. So when you were looking in the bag and you saw hard white objects wrapped in plastic, what was your belief? A. Right away I thought it was narcotics. Q. And at that point you opened the bag further? A. I did."); *id.* at 59 ("THE COURT: When you opened the bag at that point to investigate further, were you looking for a weapon at that point in time? Or what were you looking for? THE WITNESS: At that point I suspected it was narcotics. I opened it up to make sure.").

concluded above, Sergeant Barrows did not and could not actually see cocaine inside the bag before he opened the bag—so there can be no reliance here on the "plain view" exception to the search warrant requirement (an exception that is discussed in greater detail below).

These facts lead to one legal conclusion. Sergeant Barrows exceeded the permissible bounds of a *Terry* search when he decided to open the drawstring bag without reasonable suspicion to believe that the bag contained a weapon or that it was otherwise necessary to open the bag in order to protect himself from harm during the course of his limited detention of Robertson for questioning.

Nothing in this conclusion detracts from the principle that "if the frisk for a weapon is conducted in compliance with proper standards and results in recognition of the likely presence of narcotics, it is immaterial that what was discovered is not the article for which the police officers were originally and specifically looking." *United States v. Salazar*, 945 F.2d 47, 51 (2d Cir. 1991). That principle does not apply where, as here, a search is not "in compliance with proper standards" that govern a *Terry* search. *Ibid.*

Nor is it dispositive that the small drawstring bag could conceivably or hypothetically have contained a weapon. As Sergeant Barrows testified, "I have found small weapons, knives, et cetera," and "that pouch was certainly the size that could conceal an additional weapon." Doc. #38 at 22. What is dispositive is that after Sergeant Barrows seized and handled the bag to determine the nature of its contents, he had no grounds to conclude that the bag actually contained a weapon before he opened it to remove the items inside.

Indeed, he well knew that the bag did not contain a weapon. It was a small cloth bag with nothing but several rocks of cocaine wrapped in plastic inside. This is not a case involving a duffel bag or some other sizeable container from which a police officer could not have adequate

assurance for his safety without opening the bag to see what was inside. Sergeant Barrows exceeded the scope of a lawful *Terry* search for weapons.

Not to the contrary is the Second Circuit's decision in *United States v. Rogers*, 129 F.3d 76, 79 (2d Cir. 2007) (*per curiam*). In that case, the court of appeals considered a challenge to an officer's opening of a rolled-up paper bag that was found in a suspect's pocket during the course of a *Terry* stop. *Id.* at 78. The district court credited the officer's testimony that the suspect engaged in "evasive and suspicious conduct" during the course of a *Terry* stop and that the officer was "fairly certain" from an exterior patdown of the suspect's pocket that there was contraband in the pocket. *Id.* at 79. Therefore, the court of appeals—viewing the evidence in the light most favorable to the district court's findings—concluded that the items in the pocket were properly subject to search and seizure under the "plain view" exception to the warrant requirement, without further considering if the contraband was also within the scope of a proper *Terry* search for weapons. *Id.* at 80.

Here, by contrast, Sergeant Barrows did not have probable cause to believe that the drawstring bag had narcotics inside until he opened it. I do not credit Sergeant Barrows' claim that he could see cocaine inside the mostly closed drawstring bag, and I have concluded that he could not see inside the mostly closed bag as he claimed he did. Nor did Robertson engage in "evasive or suspicious" conduct during the course of the *Terry* stop, and Sergeant Barrows did not claim that he was "fairly certain" from his exterior physical handling of the bag that it contained cocaine or other contraband. Accordingly, the facts in *Rogers* involving an officer's positive identification of contraband from an external patdown of a suspect's pocket is distinguishable from this case where Sergeant Barrows did not draw any such conclusion from his external handling and examination of the drawstring bag.

22

The Government relies on language from *Rogers* stating that the officer there "was not yet able to exclude the possibility that there was a weapon in the pocket, so that the search was still within the bounds of *Terry*." 129 F.3d at 79. But these words should not be read out of context, because they concern the officer's external patdown of the suspect's pocket, not his subsequent opening of the pocket and retrieval and opening of the bag inside. The court of appeals in *Rogers* expressly declined to rule upon whether it was permissible under *Terry* to have opened the bag as the officer in *Rogers* eventually did. *Id*. at 80.

Moreover, even if I were to read *Rogers* as the Government seems to suggest, I find that Sergeant Barrows had no basis to conclude from his feel and handling of the drawstring bag in this case that there was a weapon inside. I conclude from my examination of the bag and from what was found inside the bag that Sergeant Barrows knew (and that any objectively reasonable law enforcement officer would have known) that there was no possibility that the bag contained a weapon; his external examination of the bag excluded that possibility. In short, therefore, I conclude that Sergeant Barrows exceeded the scope of a lawful *Terry* search.[6]

### 2. Consent Search

In the alternative, the Government argues that even if the search was not permitted by *Terry*, it was nevertheless valid because Robertson voluntarily consented to it. Sergeant Barrows told Robertson after seizing his pocketknife that he wanted to "check [him] for similar weapons," and Robertson responded to the effect of "go ahead." Doc. #38 at 20.

---

[6] The Government also relies on *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980), in which the court of appeals affirmed the denial of a suppression motion involving the seizure of drugs from a cereal box that was in a bag next to a suspect. That decision is inapposite, because the court there upheld the seizure of narcotics on the ground that it stemmed from a proper search incident to arrest, without addressing whether *Terry* allowed the seizure of the narcotics. *Id.* at 523–24.

A voluntary consent search is one of the well-recognized exceptions to the warrant requirement. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Moreno*, 701 F.3d 64, 72 (2d Cir. 2012). It is clear here that Robertson voluntarily consented to Sergeant Barrows' request to check him for similar weapons. Robertson's response reflected affirmative consent, not merely a silent acquiescence as Robertson contends. Although Robertson argues that he was not given a written consent form or advised of his right to refuse consent, this argument ignores well-established law that a consent need not be given in writing or be accompanied by an advisory about the right to refuse consent. *See id.* at 77; *United States v. Harris*, 167 Fed. App'x. 856, 859 (2d Cir. 2006).

Moreover, as the Government correctly notes, "there was no use of force, no intimidating movement, no brandishing of any weapons, no threat, no command, and no coercive action." Doc. #29 at 18. Nor was Robertson even under arrest at the time that he gave consent, and the fact that Sergeant Barrows acknowledged while testifying that he all along intended to arrest Robertson at some point is at best marginally relevant to whether Robertson's consent was the product of coercion. *Cf. United States v. Waltzer*, 682 F.2d 370, 374 (2d Cir. 1982) ("subjective, future intentions of the officers do not transform an investigatory stop into an arrest").

Despite the fact that there were other officers near him, there is nothing else in the facts to suggest that Robertson's consent was coerced. The Government's evidence easily shows that Robertson gave voluntary consent to Sergeant Barrows to check him for weapons similar to the pocketknife that Sergeant Barrows had just seized from him.

A closer issue is whether the scope of Sergeant Barrows' eventual search was within the scope of Robertson's consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical

reasonable person have understood by the exchange between the officer and the suspect?"
*Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Moreover, "the scope of a search is generally
defined by its expressed object." *Ibid.*

In light of Sergeant Barrows' request for permission to "check" Robertson for "similar
weapons" like the pocketknife that had been seized, I conclude that a reasonable person would
not have understood from the interaction that he was consenting to a full-blown search of his
person. *Compare Winfield v. Trottier*, 710 F.3d 49, 55 (2d Cir. 2013) (noting that "consent was
not limited to a search for guns or money because [officer's] full question did not convey any
'expressed object' of the search" but concluding that suspect's general consent for officer to look
in the trunk of her car did not extend in scope to the officer's reading of a letter in an envelope
that was found within).

The fact that consent was given to a "check" for weapons rather than some kind of
plenary "search" is further evidence of limitation. *See United States v. Snow*, 44 F.3d 133, 135
(2d Cir. 1995) (noting that "the term 'search' implies something more than a superficial, external
examination," such that "an individual who consents to a search of his car should reasonably
expect that readily-opened, closed containers discovered inside the car will be opened and
examined"). As the Seventh Circuit has observed, "[g]overnment agents may not obtain consent
to search on the representation that they intend to look only for certain specified items and
subsequently use that consent as a license to conduct a general exploratory search." *United States
v. Breit*, 429 F.3d 725, 730 (7th Cir. 2005).

I conclude that an objectively reasonable person would have understood the request by
Sergeant Barrows to "check" for weapons not to exceed the lawful bounds of a *Terry* search for
weapons. The *Terry* search framework has long been embedded in the law, and—in view of

25

*Jimeno*'s instruction that the scope of consent is determined by reference to an objectively reasonable person standard (rather than what Sergeant Barrows or Robertson actually understood or intended)—it makes sense to apply the *Terry* framework that governs the scope of a permissible weapons search to the factual context here involving a consent to no more than a "check" for weapons similar to the pocketknife that was already seized. As I have discussed above, Sergeant Barrows exceeded the lawful scope of a *Terry* search, and therefore I conclude that he also exceeded the scope of the consent he received to check Robertson for weapons.

### 3. Inevitable Discovery

The Government further argues that, even if Sergeant Barrows' search of Robertson was in violation of the Fourth Amendment, the exclusionary rule should not apply to the items seized because they would have been inevitably discovered by the police upon further investigation of the stabbing. The Government relies in particular upon portions of Sergeant Barrows' testimony stating that, if he had not arrested Robertson for the narcotics, he had intended to bring Robertson back to his police office and to require him to remove his clothing for investigation of any blood spatter evidence that might implicate him for committing the stabbing.[7]

Under the inevitable discovery doctrine, evidence that was illegally obtained will not be suppressed if the Government can prove that the evidence would have been obtained inevitably even if there had been no illegal action. *See Nix v. Williams*, 467 U.S. 431, 447 (1984); *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 102 (2d Cir. 2016). As the Second Circuit has made clear, "the burden is on the Government to prove that each event leading to the discovery

---

[7] According to the Government, if Sergeant Barrows had not discovered the narcotics on Robertson, Robertson "would not have been 'free to go at that point,'" but "would have been brought back to the office[] for further questioning" by Sergeant Barrows, and "[i]n the course of that investigation, the officers would have seized the defendant's clothing to 'check for trace evidence of anything from the stabbing, blood, et cetera,'" and "[i]n putting the defendant's clothes into inventory, the officers would have searched through the pockets of the defendant's clothes and discovered the narcotics." Doc. #46 at 22.

of the evidence would have occurred with a sufficiently high degree of confidence for the district

judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have

been discovered." *Ibid*. In other words, "the Government's obligation [is] one of 'certitude' that

the evidence would have been discovered." *Ibid.*

I have no certitude—or any confidence at all—that the cocaine in Robertson's pocket

would have been inevitably discovered. Although the Government does not say so, its theory

necessarily assumes that Robertson would have been placed under formal arrest for the stabbing,

because otherwise the police plainly would have far exceeded the lawful bounds of a *Terry* stop

by requiring him to report to their office, requiring him to disrobe, and then seizing his clothing

for forensic testing. This is a very obvious conclusion, because *Terry* allows for weapons

searches, not evidence searches, and it does not license the police to engage in strip searches of

criminal suspects.

Although the Government's inevitable discovery theory rests on a necessary assumption

that Sergeant Barrows would have had the lawful authority to arrest Robertson for the stabbing,

the Government's briefing does not contend or show that the police had probable cause to arrest

Robertson for the stabbing. Doubts about the lawful authority of the Government to arrest

Robertson for the stabbing weigh strongly against the Government's argument for inevitable

discovery. *See, e.g.*, *United States v. Heath*, 455 F.3d 52, 61 (2d Cir. 2006) ("relatively weak

evidence of the right to arrest is not sufficient, without further findings, to establish that an

officer would, in fact, have made an arrest.").

More troubling still for the Government's argument is what really happened—or, more

precisely, what did *not* happen. Robertson was never arrested for or charged with the stabbing.

The Government has offered no evidence that officers continued to question Robertson in

connection with the stabbing that night or that they in fact searched or seized his clothing for blood evidence. This itself is powerful evidence that Sergeant Barrows would not in fact have arrested Robertson for the stabbing if he had not found the narcotics and arrested him for the narcotics.

Accordingly, I conclude that the Government has not sustained its burden to show that the cocaine would have been inevitably discovered. I otherwise conclude that Sergeant Barrows searched and seized the cocaine from Robertson in clear violation of his Fourth Amendment rights and that therefore the Government should be precluded from introducing evidence of the cocaine seized by Sergeant Barrows at trial.

### B. Evidence Seized from Robertson's Apartment

As noted above, the police recovered large amounts of cocaine and firearms from the execution of search warrants for Robertson's apartment and for the safe that had been in Robertson's apartment. Robertson raises multiple and somewhat interlocking claims for suppression of this evidence.

#### 1. Robertson's Expectation of Privacy

As an initial matter, the Government argues that, because Robertson was on federal supervised release and was in violation of the conditions of his supervised release by virtue of his residence at an apartment in New London that had not been disclosed to his probation officer, "he lacked any objectively reasonable expectation of privacy in the New London apartment." Doc. #46 at 25. I do not agree.

To begin with, the Government's argument relies on an obsolete and incomplete understanding of what it is the Fourth Amendment protects. As the Supreme Court has made clear in recent years, the Fourth Amendment protects not only against searches that intrude on a

28

person's legitimate expectation of privacy, *see, e.g.*, *Katz v. United States*, 389 U.S. 347 (1967),

but it also protects against seizures as well as against any other information-seeking

governmental intrusion or trespass on one's home, papers, and effects—regardless whether such

seizures or property trespasses happen to intrude on a person's expectation of privacy. *See*

*Jardines*, 133 S. Ct. at 1417 (search); *Soldal*, 506 U.S. at 63–65 (seizure); *United States v.*

*Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016) (Gorsuch, J.); *Lavan v. City of Los Angeles*,

655 F.3d 1022, 1028–30 (9th Cir. 2012).

 Here, it is clear that officers intruded on Robertson's home and his effects for the purpose

of gathering evidence and then seized his safe and other effects—these actions were

unquestionably "searches" and "seizures" that are subject to regulation under the Fourth

Amendment. It is legally superfluous on the facts presented here whether these searches and

seizures were also accompanied by some intrusion on Robertson's expectation of privacy.

 The Government otherwise argues that Robertson's status on federal supervised release

somehow disables him from complaining about the searches and seizures from his apartment.

But Robertson's conditions of supervised release do not purport to waive or forfeit all his

constitutional rights to the sanctity of his home. To the contrary, the relevant condition of

Robertson's supervised release provides only that "[t]he defendant shall permit *a probation*

*officer* to visit the defendant at any time at home or elsewhere and shall permit confiscation of

any contraband observed in plain view *by the probation officer*." *United States v. Ellsworth*

*Robertson*, 3:07-cr-00205-SRU (Doc. #27 at 3) (emphasis added).

 Because in fact no probation officers were present for the searches and seizures from

Robertson's apartment, the condition of supervised release allowing for a visit by a probation

officer plainly does not apply here. For the same reason, because there was no involvement of

probation officers at Robertson's apartment, the Government misplaces its reliance on cases that involve searches conducted by parole or probation officers with the assistance of the police. *See United States v. Quinones*, 457 Fed. App'x. 68 (2d Cir. 2012); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004).

True enough, the Second Circuit has noted that parolees may be subject to intrusions on their privacy "that would not be constitutional if applied to the public at large." *Id.* at 665; *United States v. Reyes*, 283 F.3d 446, 457–61 (2d Cir. 2002) (discussing similarly diminished privacy rights of person on federal supervised release). But, as the court explained in *Newton*, law enforcement intrusions must nonetheless "occur pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement." *Newton*, 369 F.3d at 665. That is not what happened here.

Beyond authorizing a probation officer to visit Robertson's home and to seize contraband in plain view, there is nothing in Robertson's conditions of supervised release that declared "open season" on the rest of his constitutional rights. The conditions of Robertson's supervised release did not license the ATF or any of the other police agencies that may have had a hand in this investigation to raid his apartment and remove his belongings at their whim in the dead of the night. Although the Government complains that Robertson was untruthful to his probation officer about where he was living, there is nothing in his supervised release conditions that empowers the police—unaccompanied by any probation officer—to occupy his undisclosed home if he was untruthful to his probation officer.

The Government does not otherwise cite any cases that authorize the police to conduct their own searches of a releasee's home without the participation of a parole or probation officer, unless the background law or conditions of release allow for such a non-probation-directed

search. *See, e.g.*, *Samson v. California*, 547 U.S. 843, 852, 846 (2006) (upholding suspicionless search of parolee by a police officer, where California law imposed condition requiring parolees to "agree in writing to be subject to search or seizure by a parole officer *or other peace officer* . . . , with or without a search warrant and with or without cause") (emphasis added); *see also United States v. Warren*, 566 F.3d 1211, 1217 (10th Cir. 2009) ("a police officer may participate in a search of a parolee's home by parole officers so long as the police officer is acting under the direction of a parole officer").

The Government also quotes colorful dicta from the Second Circuit to contend that Robertson was "no more than a trespasser on society." *United States v. Roy*, 734 F.2d 108, 111 (2d Cir. 1984). But *Roy* involved the privacy rights of an escaped prisoner in a car, rather than the rights inside his home of a person who has been lawfully placed on federal supervised release. The *Roy* case is not helpful here.

In short, I conclude that Robertson's status on federal supervised release does not mean that the ordinary principles of the Fourth Amendment should not apply to the evaluation of the lawfulness of the searches and seizures at issue in this case. Robertson had rights under the Fourth Amendment against the police intrusion into his home.

### 2. Entry into Robertson's Apartment and Initiation of Protective Sweep

Robertson argues that the law enforcement officers unlawfully entered his apartment upon arresting him and that they initiated an unlawful protective sweep. I do not agree.

Although Robertson had a protected Fourth Amendment interest against the police entering his apartment, the police had a valid arrest warrant, and this arrest warrant authorized them to enter any residence where they had reason to believe that Robertson would be. *See Payton v. New York*, 445 U.S. 573, 603 (1980); *United States v. Bohannon*, 824 F.3d 242, 248–

31

50 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 628 (2017). Of course, an arrest warrant is not the same as a search warrant, such that the police were not entitled, by virtue of their entry to the apartment to arrest Robertson, to also conduct a general search of the premises for incriminating evidence. *See Mincey v. Arizona*, 437 U.S. 385, 391–92 (1978).

Still, although they lacked a warrant or authority to conduct a general evidentiary search of the apartment, the police were entitled to conduct a protective sweep of the apartment to ensure their own safety. In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that police could, incident to arrest and without probable cause or reasonable suspicion, "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. Further, the Court held that arresting officers could conduct a protective sweep beyond the spaces immediately adjoining the place of arrest if they possessed "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Ibid*. The Second Circuit has similarly permitted a security sweep of the premises even when an arrest is effected just *outside* the home, "if there are articulable facts that would warrant the reasonable belief that someone within the home is aware of the arrest outside the premises and might destroy evidence, escape or jeopardize the safety of the officers or the public." *United States v. Guerrero*, 813 F.3d 462, 467 (2d Cir.), *cert. denied*, 137 S. Ct. 98 (2016).

Here, for reasons amply established during the course of the suppression hearing, the police had good reason to conclude that other possibly dangerous persons could be inside Robertson's apartment. This included the possible presence of Robertson's confederates who had been surveilled but were unaccounted for. The police also heard sounds inside the apartment

including talking or a television, and they heard footsteps that could have been other persons. The police were legally entitled to enter the apartment and to initiate a protective sweep.

### 3. Duration and Scope of Protective Sweep and Search Incident to Arrest

Robertson argues that the officers unlawfully prolonged and exceeded the scope of a protective sweep when they decided to bring him back into the apartment after arresting him in the hallway and then to conduct searches of parts of his apartment that were purportedly within his potential reach. I agree.

In *Buie*, the Court made clear that when officers conduct a protective sweep, the sweep must last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." 494 U.S. at 335–36. That did not happen here. The police brought the handcuffed Robertson back into the apartment so that they could seat him on the couch in the entry area. It had already been five minutes since the police had initially entered the apartment. No justification exists in this record for the decision to bring him back into the apartment or to prolong his stay there by sitting him on the couch.[8]

The Second Circuit has concluded on similar facts that the extending of a protective sweep of the home was unlawful. In *United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990), the police conducted a protective sweep of a suspect's apartment upon arresting the suspect just outside the apartment, but then brought him back in to be seated on a couch. *Id.* at 445. The Second Circuit ruled that "the agents no longer had authority to remain in [defendant's] apartment after they determined that no one else was there," and that "they could not claim that

---

[8] Upon questioning by the Government, Officer Zelinski vaguely discussed police practices with respect to preparing an arrestee to be transported (*e.g.*, making sure the person has shoes and a sweatshirt) but never offered any explanation for the decision to bring Robertson back into his apartment in this particular case. *See* Doc. #38 at 203–05.

exigent circumstances justified either their continued presence or their reentry without a warrant." *Id.* at 447. The court made clear that "once police eliminate the dangers that justify a security sweep—safety of police, destruction of evidence, escape of criminals—they must, barring other exigencies, leave the residence," and "were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes." *Ibid.*

What the Second Circuit feared is what happened here. Officer Zelinski exploited the opportunity created by Robertson's having been brought back into the apartment as a pretext to open the drawer of the table by the door and to observe cocaine that was stashed there. Although a police officer may ordinarily conduct a search incident to arrest within the scope of an arrestee's grab-area "wingspan," *see Chimel v. California*, 395 U.S. 752, 763 (1969), that principle does not apply when the police manipulate this rule by moving a suspect around in order to engage in wingspan searches of areas of a home that the police would otherwise have no right to search. *See United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) (cautioning that "arresting agents are not allowed to simulate circumstances warranting application of the incident-to-arrest exception merely by bringing the item they wish to search into the area near the person arrested, or vice versa").

Nor am I convinced that Zelinski's search of the drawer was lawful, even if I assumed that it was proper for the police to have manipulated Robertson's positioning in the first place. Robertson was immobilized in double-locked handcuffs with many other police officers around. Robertson was not in any conceivable position to access the drawer and grab any firearm within. *See, e.g.*, *United States v. Cancel*, 167 F. Supp. 3d 584, 591 (S.D.N.Y. 2016) (search of defendant's bag not a lawful search incident to arrest, where defendant was handcuffed behind his back, at least one bench seat away from the bag, and was surrounded by two armed officers).

34

In short, I conclude that the police unlawfully prolonged the protective sweep and remained in the apartment well beyond the time necessitated for the sweep and to assure their safety. I further conclude that by reason of this unlawful action, they manipulated the movement of Robertson, creating a pretext for Officer Zelinski to engage in an unlawful search of the table drawer near the door of the apartment. In the alternative, even assuming the absence of pretext for bringing Robertson back into the apartment, I further conclude that Officer Zelinski's search of the table drawer exceeded the proper and necessary scope of either a protective sweep or search incident to arrest.

### 4. Seizure of the Safe

Robertson next argues that the police unlawfully seized and removed his safe from the apartment. I agree.

It is undisputed that the safe was seized and removed from the apartment without a warrant to do so. According to the testimony of the police, it was seized for "safekeeping." There is, however, no general "seized-for-safekeeping" exception to the Fourth Amendment's warrant requirement. The only conceivable exceptions to the warrant requirement that could be argued to apply here are if the safe was seized pursuant to the "plain view" exception or if the safe was seized pursuant to the "exigent circumstances" exception. I will consider each one in turn.

### a. Plain View Exception

As to the plain view exception, the Government argues that the safe was seen in plain view during the course of Officer Zelinski's protective sweep. That may be so, but the plain view exception requires more than just plain view. The police may not seize evidence pursuant to the plain view exception unless three requirements are met: (1) the police have a lawful right of access to the evidence, (2) the evidence is in plain view, and (3) the criminality of the evidence is

immediately apparent. *See Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013).

Here, the criminality of the safe was not immediately apparent (which is a requirement that is the same as probable cause, *see Minnesota v. Dickerson*, 508 U.S. at 379). Unlike cocaine, a safe is not contraband. Just seeing a safe inside a suspected drug dealer's apartment does not give rise to probable cause to seize the safe.

Agent Prather instructed the police on the scene to remove the safe. He testified that at the time he gave the order to remove the safe he had no knowledge of any contraband associated with the safe or any contraband elsewhere in the apartment. The fact that Prather knew that Robertson's confederate (Tyrone Henry) also had a safe at his apartment several miles away did not give rise to probable cause to believe that Robertson's safe contained contraband.[9] Agent Prather did not have probable cause when he ordered removal of the safe.

Nor did Officer Zelinski or any of the on-the-scene officers have probable cause to seize the safe. Officer Zelinski testified that he saw a substance on the safe during a quick glance in the course of his protective sweep, but he did not testify that he recognized the substance to be cocaine. There was no criminality that was immediately apparent when Zelinski first saw the safe in the closet.

At best, any criminality became possibly apparent only after the safe had been removed from the apartment when Officer Zelinski took a closer look at the substance on the safe while in the elevator and recognized it as a white powder substance.[10] Then it was not until an hour or

---

[9] Indeed, if Agent Prather's knowledge about Tyrone Henry's safe gave rise to probable cause to seize the safe in Robertson's apartment, it is odd that this information never found its way into the probable cause affidavits that were submitted by Officer Zelinski in support of search warrants for the apartment and the safe.

[10] The Government asserts in its post-hearing brief that "Officer Zelinski observed the safe in plain view at the bottom of the closet. On top of the safe, Officer Zelinski observed a white powdery substance that appeared to him to be narcotics, based on his training and experience." Doc. #46 at 28. Although both sentences as stated are independently true, their juxtaposition leaves an incorrect impression, because it suggests that these two

more later when the residue on the safe was field tested in the parking lot of the state police barracks that the criminality of the substance became apparent. In any event, even assuming that the criminality was apparent as early as when Officer Zelinski looked at the residue in the elevator, by that time he no longer had a lawful right of access to the safe (as required for the plain view exception), because the safe had already been illegally removed from the apartment without satisfying each of the plain view exception requirements.

Moreover, even assuming that the criminality of the residue was immediately apparent to any of the police officers while the safe was still in the apartment, then the plain view exception would have entitled them to seize or sweep up the residue itself but not also to seize the entire safe. If that were not the rule, then when police officers see drugs in plain view on a table or on a bed in someone's home, the plain view exception would entitle the police to remove not only the drugs but also the table and the bed itself. Of course, the plain view exception allows no such thing. The plain view exception did not justify seizure of the safe.

### b. Exigent Circumstances Exception

Because the plain view exception clearly does not apply here, that leaves for consideration only the exigent circumstances exception. As the Second Circuit has explained, "[e]xigent circumstances refer generally to those situations in which law enforcement officers will be unable or unlikely to effectuate an arrest, search or seizure for which probable cause exists, unless they act swiftly, even though they have not obtained prior judicial authorization." *United States v. Gallo-Roman*, 816 F.2d 76, 79 (2d Cir. 1987). Thus, the exigent circumstances

observations by Officer Zelinski happened at the same time inside the apartment when in fact they did not. Officer Zelinski testified that when he observed the safe in the closet, he saw a substance on top of the safe but did not form a belief at that time as to what it was. *See* Doc. #38 at 130 ("There was a substance on top of the safe, at the time I didn't know what it was, but there was a substance."). Only later—after the safe had been removed from the apartment and was in the elevator—did Zelinski recognize the substance as "white powder" and suspect it could be cocaine. *Id.* at 130–31, 181.

exception has one element in common with the plain view exception: the existence of probable cause that would be adequate to support issuance of a search and seizure warrant. In cases where the claimed exigency relates to the need to secure evidence pending issuance of a warrant, the exigent circumstances exception does not *substitute* for the probable cause requirement; rather, it *supplements* the probable cause requirement and allows for a search or seizure only if there is also some exigency that will not allow for resort to the normal search-and-seizure warrant application process.

For the same reasons I have just discussed above, neither Agent Prather who ordered the removal of the safe nor any other police officer on the Robertson premises had lawful probable cause to believe that the safe contained contraband at the time that it was seized and removed from the apartment. Accordingly, for this reason alone, the exigent circumstances exception does not apply.

Even assuming that there was probable cause to have searched and seized the safe, there was no exigency to justify its removal from the apartment. I do not believe Agent Prather's claim that there was no one to "sit" on the apartment pending a search warrant. In fact, there were nine officers who took part in the execution of the arrest warrant that night. Not all nine officers were needed to transport Robertson back to the police department. Indeed, there were at least two officers who crated the safe away from the apartment, first taking it to the state police barracks in Westbrook and then eventually to the ATF's office in New Haven. The very officers who were sheparding the safe away for its nocturnal odyssey across much of southern Connecticut were surely available instead to "sit" on and secure the Robertson apartment pending the issuance of a search warrant.

Moreover, Agent Prather's testimony is inconsistent with what actually happened. As the police report makes clear, the New London police department promptly decided to secure a search warrant for the apartment, taped the apartment off, and posted an officer to secure the scene. Even if there was some brief interval when no one bothered to stand guard outside the apartment, Officer Zelinski conceded when I asked him that the scene could have been secured. Doc. #38 at 184–85. There was no exigency to support an exigent circumstances exception.

In addition, the fact that the ATF and New London police waited a leisurely two days before bothering to apply for a warrant to search the safe is yet one more reason that the exigent circumstances exception does not apply here. As the Supreme Court has made clear, "a warrantless search must be strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. at 393. So, too, for warrantless seizures. The police are not privileged under the Fourth Amendment to haul away items from people's homes, citing a "safekeeping" need to preserve them for a search warrant but then to delay for no good reason in seeking a warrant.

The testimony established that nothing but administrative "logistics" convenience explained why the police waited so long to seek a warrant for the safe. Doc. #39 at 19–20. In such circumstances, where the police delay pursuit of a search warrant in a manner that contradicts their claim of some exigent reason for what they did, the exigent circumstances exception does not apply. *See, e.g.*, *G. M. Leasing Corp. v. U. S.*, 429 U.S. 338, 358–59 (1977) (the "agents' own actions, however, in their delay for two days following their first entry, and for more than one day following the observation of materials being moved from the office, before they made the entry during which they seized the records, are sufficient to support the District Court's implicit finding that there were no exigent circumstances in this case").

39

The Government misplaces its reliance on the Supreme Court's ruling in *Segura v. United States*, 468 U.S. 796 (1984). The Government cites portions of the opinion in *Segura* (Part IV of the ruling) that were joined by only two of the Court's nine justices (Chief Justice Burger and Justice O'Connor). This plurality portion of the opinion addressed whether it was proper for officers to remain in an apartment pending an application for a search warrant. The two-Justice plurality observed at one point that "different interests are implicated by a seizure than by a search," and that "a seizure affects only the person's possessory interests," while "a search affects a person's privacy interests." *Id.* at 806. It is hard to square these statements with the Supreme Court's later rulings recognizing that the Fourth Amendment may be violated by an unlawful search or seizure regardless of any intrusions on the expectation of privacy. *See Jardines*, 133 S. Ct. at 1417; *Soldal*, 506 U.S. at 63–65.

The two-Justice plurality in *Segura* went on to state that the Court "has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been held impermissible." 468 U.S. at 806; *see also id.* at 809 (noting "that society's interest in the discovery and protection of incriminating evidence from removal or destruction can supersede, at least for a limited period, a person's possessory interest in property, provided that there is probable cause to believe that that property is associated with criminal activity").

I agree with all these statements. But as I have discussed above, the police here had no probable cause to justify seizure of the safe. And they seized the safe for a far longer time than necessary to secure a warrant. Therefore, the circumstances in this case fall outside the scope of *Segura*, and *Segura* does not help the Government here.

The Government also relies on an unpublished decision from the Sixth Circuit in *United States v. Saddler*, 498 Fed. App'x 524, 529 (6th Cir. 2012). In *Saddler*, police reported to a call of shots fired and an alleged burglary at the defendant Saddler's house at approximately 1:30 in the morning. Upon arrival, they saw a locked safe in the yard, and ascertained that the safe had likely been removed from inside the house by burglars who had fled and discarded the safe in the yard upon Saddler's confronting them. After the defendant gave the police shifting explanations about who owned the safe and then refused to open it, the police seized the safe on the basis of their belief that it likely contained contraband that had been the target of the burglars. They took it to the station house where they eventually found contraband upon seeking a search warrant 22 hours later. The Sixth Circuit upheld the district court's denial of Saddler's suppression motion.

The *Saddler* case is distinguishable. First and most importantly, the court in *Saddler* concluded that the police had probable cause to support seizure and opening of the safe. *See id.* at 428. Here, by contrast, I have concluded that the police did *not* have probable cause to believe the safe contained contraband at the time that they seized it from Robertson's apartment.

Second, the court in *Saddler* found there were exigent circumstances that warranted a temporary seizure of the safe because Saddler was present on the scene and would have had access to the safe if the police had simply left it lying there in the yard until they could obtain a warrant. *Id.* at 529. Moreover, the district court in *Saddler* credited the testimony of police officers that they did not have the resources to guard the safe on-site all night while seeking a search-and-seizure warrant. *Id.* at 530. And the court concluded that the police acted with reasonable diligence after they seized the safe to apply for a search warrant. *Id.* at 531.

Here, by contrast, Robertson was already in police custody when his safe was removed from his apartment, and I have not credited the testimony that the police lacked resources to

secure or "sit" on the apartment pending a search warrant; to the contrary, I have concluded that the police actually did secure the apartment pending a search warrant, such that there was no conceivable exigency to justify carting the safe away for its all-night travels across Connecticut. In addition, I have concluded that the police did not act with due diligence to obtain a search warrant when they waited for two days for no good reason to apply for a search warrant after they had seized the safe.

In short, I conclude that the police unlawfully removed the safe from Robertson's apartment in violation of the Fourth Amendment. The police had no warrant to seize the safe when they did, and the seizure cannot be justified under the plain view or exigent circumstances exceptions to the warrant requirement.

### 5. Fruit of the Poisonous Tree and the Exclusionary Rule

The last issue I must consider is the extent to which any of the illegal searches and seizures that I have described above should lead to the exclusion of any of the later-acquired evidence by the police. As the Supreme Court has recently observed, "the exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure," as well as "evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). But because of the "significant costs" of the exclusionary rule, the Court has "recognized several exceptions to the rule." *Ibid.* One of those exceptions is known as the "attenuation doctrine," which holds that "fruits" evidence "is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the

interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Ibid.*[11]

In applying the attenuation doctrine, the Supreme Court has long instructed courts to consider three factors to determine whether evidence should be suppressed as a result of a prior police illegality. *See id.* at 2061–62 (citing *Brown v. Illinois*, 422 U.S. 590 (1975)). These three factors—known as the *Brown* factors—include: (1) "the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 2062.

As I understand it, Robertson seeks the exclusionary benefit of the fruit-of-the-poisonous -tree rule in three ways: (1) to suppress evidence from the search of Robertson's safe and apartment on the ground that this evidence was fruits of the prior illegal search of Robertson at the Mohegan Sun casino; (2) to suppress evidence from the search warrant for the apartment on the ground that this evidence was fruits from the illegally prolonged protective sweep of the apartment (including the search of the table drawer); and (3) to suppress evidence from the search warrants for both the safe and the apartment on the ground that this evidence was fruits of the prior illegal seizure of the safe. I will consider each of these three possibilities in turn.

---

[11] Although Robertson seeks exclusion under the fruit-of-the-poisonous-tree doctrine, his briefing is confused about how that rule applies (or does not apply). Instead of citing or acknowledging the Supreme Court's recent decision in *Strieff* and invoking the principles that have long guided the attenuation rule, Robertson instead cites and relies on a *different* rule—the independent source rule. *See* Doc. #42 at 19–20; *Strieff*, 136 S. Ct. at 2061 (explaining distinction between the "attenuation" and "independent source" exceptions). Accordingly, even to the extent that I agree with Robertson that the "independent source" exception does not apply here, this says nothing about whether the "attenuation" exception applies—an issue that Robertson's briefing does not address. For its part, the Government somewhat riskily does not respond at all to Robertson's fruit-of-the-poisonous-tree arguments. Although the Court has discretion on this basis alone to rule that any objection to application of the fruit-of-the-poisonous-tree exclusion has been waived or forfeited, I decline to exercise that discretion here, because I conclude that the interests of justice weigh in favor of a determination of the merits of the application of the attenuation doctrine in this case. *See, e.g.*, *United States v. Brunner*, 726 F.3d 299, 304 (2d Cir. 2013).

43

### a. Fruits of Unlawful Search of Robertson at the Mohegan Sun Casino

Robertson contends that the arrest warrant affidavit secured by Agent Prather on May 16, 2016, was based on evidence from the illegal search by Sergeant Barrows on November 7, 2015. Although I agree as a factual matter that the probable cause for Agent Prather's arrest warrant affidavit was based principally on the evidence that was illegally searched and seized from Robertson at the Mohegan Sun casino, I do not agree in light of the *Brown* factors that this is enough to warrant invocation of the exclusionary rule.

As to the first *Brown* factor (temporal proximity), this factor weighs in the Government's favor. More than six months elapsed between the seizure of narcotics from Robertson at the Mohegan Sun casino and the later issuance of the arrest warrant based on this evidence.

As to the second *Brown* factor (intervening circumstances), this weighs in Robertson's favor, because there were no independent or intervening circumstances that disrupted the causal connection between the illegal search of Robertson at the casino and the issuance of the federal arrest warrant. To the contrary, the core of probable cause for the federal arrest warrant obtained by Agent Prather was evidence of the narcotics that had been seized from Robertson at the casino.

As to the third *Brown* factor (purpose and flagrancy of the official misconduct), the Supreme Court has made clear that this consideration is "particularly significant" in view of the deterrent purposes of the exclusionary rule. *Id.* at 2062. As I have discussed above, Sergeant Barrows clearly violated Robertson's rights by deciding to open Robertson's bag despite knowing that there was no weapon inside and based on no more than a hunch that it might contain cocaine. I do not think this was merely negligent but that it was an intentional violation

of the well-known limits of a *Terry* weapons search and in disregard of Robertson's Fourth Amendment rights.

If all I were considering was the nature of Sergeant Barrows' misconduct, then I would conclude that exclusion of all the later fruits of his misconduct is appropriate (as I do for the cocaine actually seized by Sergeant Barrows). But the record does not disclose that Sergeant Barrows and his tribal police department had anything to do with the later investigation of Robertson by the flotilla of law enforcement agencies who descended upon Robertson's apartment in May 2016 (the ATF, the U.S. Marshal's Service, the statewide task force, and the New London police).

Moreover, there is nothing in this record to suggest that Agent Prather was aware of or should have been aware of the nature of Sergeant Barrows' misconduct when he relied on the results of the encounter at the casino as the primary basis to support the federal arrest warrant affidavit. For example, Sergeant Barrows' incident report does not disclose information from which it would or should have been clear to Agent Prather that Sergeant Barrows acted unlawfully. Doc. #23-1 at 2–7. So far as I can tell, Agent Prather reasonably relied on the results of Sergeant Barrows' investigation.

In such circumstances of reasonable reliance by officers of one police authority on information received from another police authority, the exclusionary rule does not ordinarily apply. *See Herring v. United States*, 555 U.S. 135 (2009) (declining to apply exclusionary rule when sheriff in one county relied on mistaken warrant information furnished by sheriff's office in another county). Accordingly, on the basis of my consideration of all the factors here, I conclude that the illegal search performed by Sergeant Barrows in November 2015 does not

warrant invocation of the exclusionary rule to exclude evidence stemming from the arrest of Robertson in May 2016.

### b. Fruits of Unlawful Search of Table Drawer in Robertson's Apartment

Next, I consider whether Officer Zelinski's unlawful search of the table drawer in the apartment requires exclusion of the evidence later acquired from the search warrants for the apartment and the safe. I conclude that it does. As to the first of the *Brown* factors, there was immediate temporal proximity of several hours between the illegal search of the drawer and the seeking of a search warrant for the apartment. Two days elapsed between the search of the table drawer and the search of the safe.

As to the second of the *Brown* factors, there were no lawful intervening causes between Officer Zelinski's discovery of the cocaine in the drawer and his decisions to seek search warrants for the apartment and for the safe.[12] To the contrary, Officer Zelinski testified in response to my questioning that his discovery of the cocaine in the table drawer was significant to his decision to apply for a search warrant. Doc. #138 at 186.

As to the third of the *Brown* factors, I conclude that Officer Zelinski's opening of the table drawer was a flagrant violation of the Fourth Amendment. For reasons I have already discussed above, the opening of the table drawer was outside the scope of a lawful protective search or search incident to arrest, and I do not credit Officer Zelinski's testimony that he needed to look into the drawer for valid safety reasons.

---

[12] It could be argued that the discovery of contraband in the apartment from execution of the search warrant for the apartment on May 18 was an intervening cause with respect to the later search warrant on May 20 for the safe. I am not persuaded. Because the evidence acquired from the search warrant for the apartment was the direct consequence of Officer Zelinski's illegal search of the table drawer and because it was Officer Zelinski who was the affiant for the search warrant for the safe, the same tainting concerns apply to the search warrant for the safe despite the fact that the warrant affidavit for the safe relied in part on evidence acquired from the execution of the search warrant at the apartment.

Moreover, the fact that Officer Zelinski omitted mention of his discovery of the cocaine in the drawer in his subsequent search warrant affidavits is additional evidence to me that he knew that what he did was illegal. Here, there is no issue of one officer relying in good faith on a search by some other officer—it was the very same officer who engaged in the illegal act (searching the table drawer) and who then sought search warrants because of his illegally acquired knowledge about contraband in the drawer. Accordingly, my consideration of the *Brown* factors leads me to conclude that the attenuation exception does not apply and that the fruits of the illegality—the searches of both the apartment and the safe—should be excluded by reason of Officer Zelinski's illegal search of the table drawer.[13]

Nor does the independent source exception apply here. It is true that neither of the search warrant affidavits relied on the illegal search of the table drawer as a basis for probable cause. But that does not matter. As the Supreme Court has made clear, in such circumstances where a police officer's illegal search has motivated him to apply for a search warrant (even if he has scrubbed the search warrant affidavit of the tainting facts and otherwise set forth probable cause for a search in the warrant affidavit), there is no "independent source" exception, and the exclusionary rule properly applies. *See Murray v. United States*, 487 U.S. 533, 542, 543 (1988) (independent source exception not applicable "if the agents' decision to seek the warrant [for

---

[13] Because the Government does not argue that the police ultimately relied in good faith on the search warrants that issued for the apartment and for the safe, I conclude that this argument has been forfeited and waived. In any event, even recognizing that exclusion of evidence is not warranted if law enforcement officers have relied in good faith on a warrant, *see United States v. Ganias*, 824 F.3d 199, 221–22 (2d Cir. 2016) (en banc), no such claim is tenable here in light of Officer Zelinski's misleading statements about the safe that he made in the affidavit for the apartment search warrant (as described earlier in this ruling) and in light of the fact that it was not objectively reasonable for him to believe that it was lawful for the safe to have been removed from the apartment and therefore to rely in his warrant affidavit on the testing of residue from the safe. *See United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.) (good faith exception not applicable where officer included facts in warrant affidavit that were "almost calculated to mislead" such that "the issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue"), *aff'd and amended*, 91 F.3d 331 (2d Cir. 1996) (*per curiam*).

search of warehouse] was prompted by what they had seen during the [illegal] initial entry" of the warehouse, and remanding for further consideration because district court "did not . . . explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse"); *see also United States v. Hill*, 776 F.3d 243, 252–53 (4th Cir. 2015) (same).

### c. Fruits of Unlawful Seizure of the Safe

Lastly, I consider whether the unlawful seizure and removal of the safe from Robertson's apartment requires exclusion of the evidence later acquired from the search warrants for both the apartment and the safe. I conclude that exclusion is warranted in light of the *Brown* factors and the deterrent purposes of the exclusionary rule.

First, as to temporal proximity, the unlawful seizure of the safe proximately led to the field testing of the exterior of the safe at the police barracks. That testing occurred around 2:30 a.m. on May 18 and was only possible because the officers had illegally seized the safe.[14] Just several hours later, Officer Zelinski relied on this illegal seizure and testing as the principal component of probable cause for his affidavit in support of the search warrant for the apartment. He also relied on it for the search warrant affidavit that he submitted two days later for the safe itself. The first *Brown* factor of temporal proximity weighs against the Government.

As to the second *Brown* factor of intervening causes, there were no lawful intervening causes between the illegal removal and testing of the safe and the later applications for search

---

[14] Because the officers had illegally seized the safe, the testing could not be justified under the plain view exception, which requires that a police officer have a lawful right of access to an object that is in plain view and for which its criminality is immediately apparent. *See Arizona v. Hicks*, 430 U.S. 321 (1987) (plain view exception not applicable where police officers who were otherwise lawfully inside an apartment physically moved an object a few inches in order to record a serial number). Nor was the testing proper under any formulation of the protective sweep doctrine. Because the field test of the safe was itself a fruit of the prior illegal removal of the safe from Robertson's apartment, I need not decide whether the field test itself was an unlawful search under the physical trespass/intrusion doctrine revived by the Supreme Court in *United States v. Jones*, 565 U.S. 400 (2012). *See also Ackerman*, 831 F.3d at 1307 (Gorsuch, J.) (explaining why *Jones* calls into question prior Supreme Court precedent suggesting that a field test for narcotics does not constitute a "search" under the Fourth Amendment).

warrants. As noted, the field testing of the safe was the central fact relied on to establish probable cause in the affidavit for the search of the apartment on May 18, and it was also an important fact for purposes of establishing probable cause for the warrant to search the safe on May 20.

As to the third *Brown* factor, it is clear that the officers flagrantly violated the Fourth Amendment. The officers knew they had no lawful probable cause to seize and remove the safe from the apartment. Agent Prather testified that he knew of no illegal contraband having been found in the apartment, but he ordered the safe to be taken anyway. It is telling that the core of probable cause for the apartment search warrant was the field testing of the safe; but because that field testing occurred only *after* the safe was removed from the apartment (a fact not disclosed by Officer Zelinski in his apartment search warrant affidavit), it is clear that Officer Zelinski and the other officers knew—just as Agent Prather knew—that there was no lawful probable cause to justify the seizure and removal of the safe in the first instance. The safe was taken for no more than the officers' investigative convenience and with no regard for the Fourth Amendment.

The deterrence interests that lie behind the exclusionary rule weigh strongly here. The police should know that there are exclusionary consequences when they engage in conduct that any reasonable law enforcement officer would know is a violation of the Fourth Amendment. If the police enter a home pursuant to an arrest warrant, they should know that there are constitutional limitations on what they may do while inside the home. They should know that an arrest warrant is not a substitute for a search-and-seizure warrant, and they should know that they may not seek to transform an arrest warrant into the equivalent of a search-and-seizure warrant by manipulatively exploiting other exceptions to the Fourth Amendment's warrant requirement.

The police should know that they may not pretextually exceed the scope of a protective sweep or search-incident-to-arrest in order to seek out evidence of drug dealing as Officer

Zelinski did here. The police should know that they may not haul away a homeowner's physical possessions for "safekeeping" as Agent Prather ordered here if they do not have probable cause and exigent reasons why they cannot wait to seize such items until a warrant is secured. The Fourth Amendment protects the people's homes and property, even the homes and property of previously convicted felons like Robertson. Exclusion is warranted here.

### CONCLUSION

To summarize:

(1) Sergeant Barrows violated the Fourth Amendment during the course of his search and seizure of cocaine from Robertson at the Mohegan Sun casino on November 7, 2015;

(2) Officer Zelinski violated the Fourth Amendment during the course of his search of the table drawer at Robertson's apartment on May 18, 2016;

(3) Agent Prather violated the Fourth Amendment when he ordered the seizure and removal of the safe from Robertson's apartment on May 18, 2016;

(4) the foregoing violations of the Fourth Amendment were reckless and flagrant, tainting the validity of all the incriminating evidence seized by law enforcement from Robertson on November 7, 2015, from Robertson's apartment on May 18, 2016, and from Robertson's safe on May 20, 2016;

(5) the remedy of exclusion of evidence is justified and warranted.

For the foregoing reasons, defendant's motion to suppress (Doc. #22) is GRANTED.

It is so ordered.

Dated at New Haven, Connecticut, this 8th day of March 2017.

 /s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge